NO. COA13-759

NORTH CAROLINA COURT OF APPEALS

Filed: 18 March 2014

IN THE MATTER OF:
APPEAL OF: Pace/Dowd Properties
Ltd. from the decisions of the
Union County Board of Equalization
and Review regarding the
valuations of certain property for
tax year 2010.

North Carolina Property Tax
Commission
No. 10 PTC 638

Appeal by Union County from final decision entered 24 January 2013 by the North Carolina Property Tax Commission. Heard in the Court of Appeals 20 November 2013.

> *K&L Gates LLP, by Samuel T. Reaves, for Pace/Dowd Properties, Ltd.*
>
> *Hamilton Stephens Steele & Martin, PLLC, by Rebecca K. Cheney, for Union County.*

McCULLOUGH, Judge.

Union County appeals from a decision by the North Carolina Tax Commission, holding that Union County used an arbitrary method of valuation in assessing two parcels of land owned by Pace/Dowd Properties, Ltd. Based on the following reasons, we affirm the decision of the North Carolina Tax Commission.

I. Background

Union County appeals from a 24 January 2013 "Final Decision" of the North Carolina Property Tax Commission ("Commission") concerning the tax value of two parcels of land located within Union County. The two parcels of land at issue, purchased by appellee Pace/Dowd Properties Ltd. ("Pace/Dowd"), consist of Union County Tax Parcel Number 06-135-003 ("Parcel 3") and Parcel Number 06-135-003A ("Parcel 3A"). Parcel 3 is comprised of 216 acres of land. Pace/Dowd purchased it in 2005 for $11,212,500, with the intent to develop Parcel 3 as the second and third phases of a residential development called "Lawson" with 245 lots. Parcel 3A is comprised of 173.85 acres of land. It was purchased in 2003 for $7,375,298, with the intent to develop Parcel 3A as the fourth phase of the Lawson development with 404 lots.

During Union County's 2008 countywide general reappraisal, Parcel 3 was valued by Union County at a property tax value of $10,201,240 and Parcel 3A was valued at $1,135,420. In 2009, Pace/Dowd did not appeal the tax valuations. However, in 2010, Pace/Dowd contested the value of both parcels by filing an appeal with the Union County Board of Equalization and Review ("County Board").

Union County became aware it had wrongly classified Parcel 3A as a subdivision common area and notified Pace/Dowd that it was increasing the tax value of Parcel 3A to $9,166,280 effective 1 January 2008 for tax years 2008, 2009, and 2010. The County Board heard Pace/Dowd's challenges to Union County's assessments on 22 June 2010 and declined to consider Pace/Dowd's appeal on Parcel 3 for tax years 2008 and 2009. Furthermore, the County Board reduced the value of Parcel 3 from $10,201,240 to $7,975,200 effective 1 January 2010 and affirmed the valuation of Parcel 3A at $9,166,280.

Subsequently, Pace/Dowd appealed to the Commission, presenting several issues. First, Pace/Dowd argued that the subject parcels were appraised in excess of the true value of the subject property as of 1 January 2008. Pace/Dowd asserted that the assigned values exceeded fair market value ("FMV") as defined in N.C. Gen. Stat. § 105-283 and that the FMV of Parcel 3 should be $2,400,000 and the FMV of Parcel 3A should be $1,837,500. Next, Pace/Dowd argued that Union County applied an arbitrary method of appraisal in reaching the following values: Parcel 3 valued at $10,201,240 and later reduced to $7,975,220; Parcel 3A valued at $1,135,420 and later increased to

$9,166,280. Lastly, Pace argued that Union County improperly "discovered" Parcel 3A for tax years 2008, 2009, and 2010.

Following hearings held on 15 February 2012 and 18 April 2012, the Commission entered the "Final Decision" on 24 January 2013. The Commission made the following findings of fact, in pertinent part:

4. Under orders of the State of North Carolina (the "State"), Union County imposed a moratorium on new sewer taps in February 2007. Thereafter, the State denied Union County's request to expand its largest sewer treatment plant, and the moratorium continued.

5. On September 17, 2007, Union County adopted the "Policy for Allocating Wastewater Treatment Capacity ("SAP"), after which the State allowed Union County to lift the moratorium.

6. Pursuant to the SAP, 50 lots within Parcel [3] and 100 lots within Parcel [3A] were included within the first priority of properties to receive sewer and permits and 449 lots from Parcel [3] and [3A] were placed in the last priority of properties to receive sewer permits. Notwithstanding that [Pace/Dowd] purchased the subject parcels at purchase prices which included water and sewer capacity for residential development, the parcels were never developed.

7. As of the January 1, 2008 countywide general reappraisal of all real property in Union County, Parcel [3] was assessed at a value of $10,210,240, and, based upon [Pace/Dowd's] 2010 appeal, the

County Board reduced the assessment to a value of $7,975,220; and, based upon [Pace/Dowd's] 2010 appeal, Union County increased the assessed value of parcel [3A] from $1,135,420 to $9,166,280 and assigned the increased value of $9,116,280 for tax years 2008, 2009 and 2010. Further, Union County has collected taxes from [Pace/Dowd] based on the increased value of Parcel [3A] ($9,166,280) for tax years 2008, 2009 and 2010.

8. Union County is required to value all property for *ad valorem* tax purposes at its true value in money, which is "market value." N.C. Gen. Stat. § 105-283. . . .

9. An important factor in determining the property's market value is its highest and best use. The highest and best use of the subject property, as improved, would be residential development. . . .

10. However, under orders of [the State], Union County imposed a moratorium on new sewer taps in February 2007, which caused declines in the market values of the subject parcels. Accordingly, Union County shall, whenever any real property is appraised, consider the factors set forth in N.C. Gen. Stat. § 105-317. In particular, Union County shall consider how the county's sewer allocation policy affects the market value of the subject parcels, and the availability of water and sewer to Parcels [3 and 3A].

11. Consequently, [Pace/Dowd] did rebut the initial presumption of correctness as to Union County's assessments of the subject parcels by offering evidence tending to show that Union County used an arbitrary method of assessment and that Union

County's assessments of the subject parcels substantially exceeded the market values of the parcels when the county assessed Parcel [3] at a value of $7,975,220; and by increasing the valuation of Parcel [3A] from $1,135,420 to $9,166,280, and when Union County did not consider the factors set forth in N.C. Gen. Stat. § 105-317 (i.e. the availability of water and sewer to Parcels [3 and 3A]).

12. Accordingly, the burden then shifts to Union County to go forward with the evidence and to demonstrate that its methods would in fact produce true value[.]

13. [T]he Commission . . . determines that Union County did not meet its burden regarding the valuations of the subject parcels when Union County did not consider certain relevant factors, as required by N.C. Gen. Stat. § 105-317[.]

14. Accordingly, the Commission, when considering the expert testimony of Mr. Willcox [sic], finds that the true value in money, which is "market value," as that term is defined in N.C. Gen. Stat. § 105-283, for Parcel [3] was $3,987,600, and the true value in money of Parcel [3A] was $4,583,140.

The Commission concluded that Pace/Dowd rebutted the presumption that Union County's *ad valorem* tax assessment was correct by showing that the county tax supervisor used an arbitrary method of valuation and that the assessments substantially exceeded the true value in money of the parcels.

Furthermore, the Commission determined that the true value in money of Parcel 3 was $3,987,600 and the true value in money of Parcel 3A was $4,583,140 as of the 1 January 2008 appraisal.

Union County appeals.

## II.  Standard of Review

In reviewing a decision from the North Carolina Property Tax Commission:

> [this] court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action.  The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional provisions; or
> (2) In excess of statutory authority or jurisdiction of the Commission; or
> (3) Made upon unlawful proceedings; or
> (4) Affected by other errors of law; or
> (5) Unsupported by competent material and substantial evidence in view of the entire record as submitted; or
> (6) Arbitrary or capricious.

N.C. Gen. Stat. § 105-345.2(b) (2013).

"[A]n act is arbitrary when it is done without adequate determining principle." *In re Parkdale Mills*, __ N.C. App. __, __, 741 S.E.2d 416, 419 (2013) (citation omitted).

Our Court "shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error." N.C.G.S. § 105-345.2(c).

> The "whole record" test does not allow the reviewing court to replace the [Commission's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*. On the other hand, the "whole record" rule requires the court, in determining the substantiality of evidence supporting the [Commission's] decision, to take into account whatever in the record fairly detracts from the weight of the [Commission's] evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the [Commission's] result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.

*In re Parkdale Mills*, __ N.C. App. at __, 741 S.E.2d at 419 (citation omitted).

However, "the 'whole record' test is not a tool of judicial intrusion; 'instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a

rational basis in the evidence.'" *In re Appeal of Owens*, 132 N.C. App. 281, 286, 511 S.E.2d 319, 323 (1999) (citation omitted). "[T]his Court cannot reweigh the evidence presented and substitute its evaluation for the Commission's." *In re Parkdale Mills*, __ N.C. App. at __, 741 S.E.2d at 419 (citation omitted). "If the Commission's decision, considered in the light of the foregoing rules, is supported by substantial evidence, it cannot be overturned." *In re Appeal of Philip Morris*, 130 N.C. App. 529, 533, 503 S.E.2d 679, 682 (1998) (citation omitted).

### III. <u>Discussion</u>

On appeal, Union County argues that the Commission erred by: (A) concluding that Pace/Dowd had rebutted the presumption that Union County's *ad valorem* tax assessment was correct by finding that Union County used an arbitrary method of valuation, resulting in a valuation of the parcels substantially exceeding the true values; (B) finding that as of 1 January 2008, the true values of the parcels were $3,987,600 for Parcel 3 and $4,583,140 for Parcel 3A; and (C) concluding, in conclusion of law number 3, that Pace/Dowd does not owe additional 2008 and 2009 taxes for Parcel 3A.

### A. <u>Union County's Method of Valuation</u>

First, Union County asserts that the Commission erred by concluding that Pace/Dowd had rebutted the presumption set out in *In re Appeal of Amp, Inc.*, 287 N.C. 547, 215 S.E.2d 752 (1975). Union County argues that the Commission erroneously found that Union County used an arbitrary method of valuation, resulting in a valuation of the parcels which substantially exceed the true value in money. We disagree.

In *In re Appeal of Amp, Inc.*, 287 N.C. 547, 215 S.E.2d 752 (1975), our Supreme Court stated that it is a "sound and [] fundamental principle of law in this State that ad valorem tax assessments are presumed to be correct." *Id.* at 562, 215 S.E.2d at 761 (citation omitted). "[T]he presumption is only one of fact and is therefore rebuttable." *Id.* at 563, 215 S.E.2d at 762 (hereinafter "the *Amp* presumption").

> [I]n order for the taxpayer to rebut the presumption he must produce competent, material and substantial evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of valuation; AND (3) the assessment *substantially* exceeded the true value in money of the property.

*Id.* (citations and quotation marks omitted) (emphasis in original). "[I]t is not enough for the taxpayer to show that the means adopted by the tax supervisor were wrong, he must also

show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably high*." *Id.* (citation omitted) (emphasis in original).

N.C. Gen. Stat. § 105-286(a) (2013) provides:

> (a) Octennial Cycle. - Each county must reappraise all real property in accordance with the provisions of G.S. 105-283 and G.S. 105-317 as of January 1 of the year set out in the following schedule and every eighth year thereafter[.]

N.C. Gen. Stat. § 105-283 (2013), entitled "Uniform appraisal standards," states that:

> [a]ll property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

When real property is being appraised, our General Assembly has mandated that

> it shall be the duty of the persons making appraisals:
> (1) In determining the true value of land, to consider as to each

> tract, parcel, or lot separately listed at least its advantages and disadvantages as to location; zoning; quality of soil; waterpower; *water privileges*; . . . adaptability for agricultural, timber-producing, commercial, industrial, or other uses;. . . . and any other factors that may affect its value except growing crops of a seasonal or annual nature.

N.C. Gen. Stat. § 105-317(a)(1) (2013) (emphasis added).

At the hearing before the Commission, Pace/Dowd called four witnesses: Steven Pace, principal and president of Pace/Dowd who was tendered as an expert in real property acquisition and residential development; Robert Palmer Wilcox, Jr., an expert in soil science; Alfred Tucker, an appraiser; and Phillip Every, serving as an adverse witness.

Steven Pace testified that Pace/Dowd purchased the parcels with the intention to develop Parcel 3 as phases 2 and 3 of the Lawson development, with 245 lots, and to develop Parcel 3A as phase 4 of the Lawson development, with 404 lots. When Pace/Dowd purchased the parcels, Pace/Dowd did not have sewer and water permits, but Steven Pace testified that he made the purchases after he "confirmed [verbally] with Union County that there would be absolutely no restrictions at all on me having sewer and water to develop this site[.]" Steven Pace admitted

that although he did not have written confirmation from Union County, he did receive reasonable assurances from the Director of Public Works that he would "be able to get sewer and water without any restrictions for capacity or moratoriums." At no point during his testimony did Steven Pace testify as to Union County's method of valuing the parcels.

Robert Palmer Wilcox, Jr., a soil science expert with Soil and Material Engineers, testified regarding his evaluation of the septic system needs and sewer capacity of both parcels. Wilcox testified that in September 2007, he performed a preliminary soil evaluation of Parcel 3. Wilcox determined that greater than fifty (50) to sixty (60) percent of Parcel 3 was "in that category of not being able to be utilized for septic suitability." In January 2012, Wilcox separately evaluated Parcel 3 and testified that there was no chance that the soil conditions could have changed from 1 January 2008. Wilcox's findings in regards to Parcel 3A were "very identical" to the findings of Parcel 3 "as there is very limited capacity to use on-site septic systems[.]"

Phillip Every, appraisal manager of Union County and mass appraiser certified by the State of North Carolina, testified that he reviewed the final numbers for the 1 January 2008

revaluation. Every testified, that as a mass appraiser valuing 93,000 parcels, he uses "models to capture valuation – to reflect valuation in the marketplace and apply that to large masses of the properties to come up with a, hopefully, rational, reasonable reflection of the value of the property." As part of mass appraisal, a schedule of values ("SOV") is developed. Every testified that a SOV is "our means, our methods, our numbers we're going to use to determine valuation, and it has to be approved by our commissioners." "The objective of the schedules is to develop standards by which all property is valued at market value." Every agreed that "for a property to be developed residentially, you would have to have some sewer and water available" and also agreed that all other things being equal, "the value of property with access to sewer and water . . . is greater than the value of the same property without the access."

In regards to the 1 January 2008 valuation, Every testified that Union County was required by statute to appraise the parcels at its true and actual value in money, which meant that Union County "is required to consider each parcel separately listed as to its particular advantages and disadvantages and its

adaptability to particular uses." Nonetheless, Every testified to the following:

> [Pace/Dowd:] Do you make a determination in carrying out that analysis of what the highest and best use of the property is?
>
> [Every:] Yes.
>
> [Pace/Dowd:] And did you make a determination – did the County make a determination with respect to the Pace parcels as to what the highest and best use of those parcels were as of the date of revaluation?
>
> [Every:] We valued it as raw land. Large acreage, raw land.
>
> [Pace/Dowd:] Did you value it as raw land for residential construction or not for residential construction?
>
> [Every:] Just say large acreage of raw land. We didn't go any further than that.
>
> . . . .
>
> [Every:] We did not parse it down that fine, no. We valued the land all of the parts. We made no premium – put no premium on it to be a subdivision.
>
> . . . .
>
> [Pace/Dowd:] Okay. Now, did you – did the County, in conducting the reappraisal of these lots in connection with the countywide revaluation in January of 2008, take the SAP into account?
>
> [Every:] Directly, no.

> [Pace/Dowd:] When you say, "Directly, no," what do you mean?
>
> [Every:] In that this problem had been well-known for a great period of time, I believe back to 2003, that the County was our [SIC] sewer and water. I believe that the sales we used, the majority of the sales in this list were sold and bought knowing that sewer and water was an issue. So I believe that this problem was already accounted for in these land sales. So I believe in that way, yes, we did. Did we then go out and do something in addition after the sale? No, we didn't.

Furthermore, Every testified that in selecting comparable parcels to assist in valuing the parcels at issue, Union County did not take sewer and water availability into account.

> [Every:] [W]e weren't going and looking at these large-acreage tracts and go, which ones have sewer and water, which ones don't. We just were looking at, we have sales, and there are large-acreage tracts, and we'll use them for the valuation of other large-acreage tracts.

The comparables Every used concerned sales of property made from 2004 through 2006. None of the comparables used were from dates on or after Union County adopted the SAP in 2007. Also, in selecting comparables, Every testified that Union County selected comparables that were within the same school district. When questioned regarding this method of selecting a comparable, the following exchange occurred:

[Pace/Dowd:] And, Mr. Every, do you have any evidence that you're prepared to present that would say that the market value, the school zones of raw, undeveloped land would affect market value so significantly that you're only going to consider comparables in the same school zone?

[Every:] I believe that location is a very well-established appraisal principle. You can get fairly close [geographically], and we did that. . . . And I believe, again, that in our – in our situation, schools are a prime driver. . . .

[Pace/Dowd:] But – but beyond just that general statement, you don't have anything specifically that would correlate property value to the school zone?

[Every:] Do I have anything prepared for you today? No.

Every explained that he did not rely on any data that supported the idea that a specific school zone had a greater increase in value over a property located in another school zone but rather limited comparables to school zones because it was "the simplest solution."

Alfred Louis Tucker, Jr., also testified at the hearing. Tucker, an expert witness for Pace/Dowd, testified that he owned his own appraisal company, A.O. Tucker and Associates. Tucker completed two appraisals of the properties; one on 29 June 2007 valued as of 12 June 2007, and one on 10 May 2011 valued as of 1 January 2008. The purpose of the June 2007 appraisal was for

mortgage loan financing. As of 12 June 2007, Tucker appraised Parcel 3 at $14,565,000 and Parcel 3A at $15,321,750, with both of these values reflecting his assumption that sewer and water would be available.

Tucker also performed an appraisal of the parcels in May of 2011 valued as of 1 January 2008, the date of the last Union County tax revaluation. Parcel 3 was valued at $2,400,000 and Parcel 3A was valued at $1,837,500. Tucker's 2008 appraisal took into consideration the SAP, providing that "[a]ccording to local developers and officials in the Union County Public Works Department, no water or sewer taps are expected to be available to the [parcels] for some 6 to 8 years from January 1, 2008, the date of the last Union County tax revaluation." Union County argues, and Pace/Dowd concedes, that the Commission extensively questioned Tucker's 2007 appraisal and ultimately did not adopt his valuation or cite his opinion in the 24 January 2013 Final Decision.

Union County argues that even if Pace/Dowd was able to rebut the *Amp* presumption, Union County was able to establish that its method of valuing the parcels produced true values. Union County relies on Every's testimony to support its contention that there was no evidence to support the conclusion

that Union County used an arbitrary appraisal method. However, we find this argument to be without merit. The evidence discussed above sufficiently supports the Commission's finding that Pace/Dowd rebutted the *Amp* presumption "by offering evidence tending to show that Union County used an arbitrary method of assessment . . . when Union County did not consider the factors set forth in N.C. Gen. Stat. § 105-317 (i.e. the availability of water and sewer to Parcels [3] and [3A])." Applying the whole record test, we conclude that the Commission's finding is rationally based on testimony provided by Every, which established that Union County failed to consider water and sewer availability in its valuation of the parcels.

Because the challenged findings and conclusions of the Commission have a rational basis in the evidence and it is not our duty to substitute our judgment for that of the Commission, we overrule Union County's arguments.

B.   <u>True Value of Parcel 3 and Parcel 3A as of 1 January 2008</u>

Next, Union County argues that the Commission erred by finding the true value of Parcel 3 to be $3,987,600 and Parcel 3A to be $4,583,140 as of the 1 January 2008 general reappraisal where there was no competent evidence in the record to support this valuation. We disagree.

In the 24 January 2013 "Final Decision," the Commission found the following:

> 14.    Accordingly, the Commission, when considering the expert testimony of Mr. Willcox [sic], finds that the true value in money, which is "market value," as that term is defined in N.C. Gen. Stat. § 105-283, for Parcel [3] was $3,987,600, and the true value in money of Parcel [3A] was $4,583,140.

In a footnote to finding of fact 14, the Commission stated that:

> Based upon the expert testimony of Mr. Robert P. Willcox [sic], Jr., L.S.S., an expert in soil sites, Union County should reduce the county's values of Parcels [3] and [3A] by fifty percent (50%).   (See Stipulation 3(w) stating that the county contends the value of Parcel [3] to be $7,975,200.   ($7,975,200 divided by 50% = $3,987,600 for Parcel [3] and $9,166,280 divided by 50% = $4,583,140 for Parcel [3A]).

After thorough review, we conclude that the record sufficiently supports the Commission's finding that Union County's arbitrary method of assessment resulted in an assessment of the parcels that substantially exceeded the market values of the parcels.   The Commission relied on Wilcox's testimony, which provided that greater than fifty (50) to sixty (60) percent of the parcels was "in that category of not being able to be utilized for septic suitability."   Based on Wilcox's expert testimony, the Commission reduced Union County's values

of the parcels by fifty percent (50%) resulting in values of $3,987,600 ($7,975,200 divided by 50%) for Parcel 3 and $4,583,140 ($9,166,280 divided by 50%) for Parcel 3A. Accordingly, we overrule Union County's arguments.

## C. Conclusion of Law Number 3

In its last argument, Union County contends that the Commission erred by concluding the following:

> 3. . . . Union County improperly "discovered" Parcel [3A] for tax years 2008 and 2009 when N.C. Gen. Stat. § 105-287 is the applicable statute regarding [Pace's] appeal.

Originally, after Pace/Dowd challenged Union County's property tax values of Parcel 3A in 2010, Union County sent notice to Pace/Dowd that it had "discovered" Parcel 3A by increasing the value to $9,166,280 for tax years 2008 and 2009. This "discovery" implicates N.C. Gen. Stat. § 105-312 (2013), titled "Discovered property; appraisal; penalty." Union County now argues that N.C.G.S. § 105-287 is not applicable to the case *sub judice* and that N.C. Gen. Stat. § 105-394 is the correct statute regarding Pace/Dowd's appeal, allowing Union County to recover taxes on the corrected value of Parcel 3A for years 2008 and 2009. We disagree.

N.C. Gen. Stat. § 105-287, titled "Changing appraised value of real property in years in which general reappraisal is not made," provides the following:

> (a) In a year in which a general reappraisal of real property in the county is not made under G.S. 105-286, the property shall be listed at the value assigned when last appraised unless the value is changed in accordance with this section. The assessor shall increase or decrease the appraised value of real property, as determined under G.S. 105-286, to recognize a change in the property's value resulting from one or more of the following reasons . . . .

N.C.G.S. § 105-287(a) (2013). The statute proceeds to list reasons such as: to correct a clerical or mathematical error; to correct an appraisal error resulting from a misapplication of schedules, standards, and rules used in the county's most recent general appraisal; to recognize an increase or decrease in the value of the property resulting from a conservation or preservation agreement, a physical change in the land or improvements on the land, and a change in the legally permitted use of the property, etc. *Id.*

N.C. Gen. Stat. § 105-394, titled "Immaterial irregularities," provides the following:

> Immaterial irregularities in the listing, appraisal, or assessment of property for taxation or in the levy or collection of the

> property tax or in any other proceeding or requirement of this Subchapter shall not invalidate the tax imposed upon any property or any process of listing, appraisal, assessment, levy, collection, or any other proceeding under this Subchapter.

N.C.G.S. § 105-394 (2013). Examples of immaterial irregularities are listed. Union County argues that "[t]he failure to list, appraise, or assess any property for taxation or to levy any tax within the time prescribed by law" is the applicable subsection to the facts before us. N.C.G.S. § 105-394(3).

Union County relies on two cases for their arguments: *In re Appeal of Morgan*, 186 N.C. App. 567, 652 S.E.2d 655, (2007), rev'd, 362 N.C. 339, 661 S.E.2d 733 (2008), and *In re Appeal of Dickey*, 110 N.C. App. 823, 431 S.E.2d 203 (1993). However, we find both of the cases to be distinguishable from our present case and hold neither of these cases to be controlling.

In *Morgan*, although the taxpayers had listed their residence on the county tax listing form in 1993 and an appraiser with Henderson County's Tax Assessor's Office visited the taxpayers' property during countywide reappraisals in 1999 and 2003, the tax assessor *failed to assess any taxes* on the residence from the years 1995 through 2003. *Morgan*, 186 N.C. App. at 568, 652 S.E.2d at 656. In 2004, Henderson County's Tax

Assessor's Office finally assessed taxes on the residence and asserted that the taxpayers owed back taxes and interest in the amount of $8,533.61 for tax years 1995 through 2003. *Id.* The Commission concluded, and our Court affirmed, that the failure of the tax assessor to assess taxes on the residence was not an "immaterial irregularity" pursuant to N.C.G.S. § 105-394 and barred Henderson County from attempting to collect back taxes. *Id.* Our Court held that N.C.G.S. § 105-394 was "intended to cover cases where there is no dispute that but for the *clerical error*, the tax would have been valid." *Id.* at 571, 652 S.E.2d at 658 (citation omitted) (emphasis in original). Henderson County's failure to assess the residence was not an "immaterial irregularity" because it was neither a clerical nor administrative error. *Id.* at 570, 652 S.E.2d at 657. In a dissenting opinion, Judge Geer stated that the plain language of N.C.G.S. § 105-394 did not require that the failure to assess any property for taxation be due to a clerical or administrative error. Rather, Judge Geer opined that Henderson County's failure to assess the taxpayers' residence within the time prescribed by law constituted an immaterial irregularity pursuant to N.C.G.S. § 105-394 and that it did not invalidate the tax levied on the property. *Id.* For the reasons stated in

Judge Geer's dissent, our Supreme Court reversed the Court of Appeal's opinion in *In re Appeal of Morgan*, 362 N.C. 339, 661 S.E.2d 733 (2008).

In *Dickey*, the taxpayers purchased a lot and a newly constructed house in 1988 for $272,500.00. The taxpayers submitted their "1989 Property Tax Listing" and the 1989 tax bill from Forsyth County assessed the taxpayers' real property valued at $37,500.00. *Dickey*, 110 N.C. App. at 824, 431 S.E.2d at 204. In 1990, the tax assessor notified the taxpayers that their property "ha[d] been taxed improperly" for the year 1989. The tax assessor, "pursuant to N.C.G.S. § 105-312 (discovered property), added to the previously assigned value the sum of $185,500.00, and assessed the [taxpayers] an additional $2,094.30 in taxes." *Id.* at 825, 431 S.E.2d at 204. The taxpayers appealed to Forsyth County, which dismissed their appeal. *Id.* The taxpayers then appealed to the Commission, and the Commission found that the taxpayers properly listed their house on the property tax listing dated 17 January 1989 "on a portion of the listing form which was designed to be torn off if it was not completed." The Commission stated that "[a]fter receipt by the County, this portion of the form was removed and destroyed even though it had been completed by the [taxpayers.]"

*Id.* at 825, 431 S.E.2d at 204. Because the taxpayers submitted a timely and accurate property tax listing, the improvements on the taxpayers lot were not considered "discovered" property under N.C.G.S. § 105-312. Furthermore, the Commission found that because the tax assessor appraised the house at a value of $0.00 for the tax year 1989, pursuant to N.C.G.S. § 105-287, the assessor was authorized to reappraise the house in 1990. Such reappraisal was effective as of 1 January of the year in which it is made and was not retroactive. *Id.* at 825, 431 S.E.2d at 205. Forsyth County appealed. Our Court held that because the tax assessor never "appraised" the taxpayer's house for tax purposes in 1989 as defined in N.C.G.S. § 105-273[1], N.C.G.S. § 105-287 had no application. "There is no evidence that the Assessor prior to 1990 attempted to ascertain the true value of the [taxpayers'] house, and it is undisputed that the true value of the house in 1989 was not *zero* dollars." *Id.* at 828, 431 S.E.2d at 206. Forsyth County argued that the tax assessor's failure to levy any tax on the house was an "immaterial irregularity" and our Court agreed that N.C.G.S. § 105-394 applied since it had been previously established that "a

---

[1]N.C. Gen. Stat. § 105-273 (2013) defines "appraisal" as "[t]he true value of property or the process by which true value is ascertained."

clerical error by a tax supervisor's office is an immaterial irregularity under G.S. 105-394 so as not to invalidate the tax levied on the property." *Id.* at 829, 431 S.E.2d at 207 (citing *In re Notice of Attachment*, 59 N.C. App. 332, 333-34, 296 S.E.2d 499, 500 (1982)).

In both *Morgan* and *Dickey*, the properties at issue had never been "appraised" as defined in N.C. Gen. Stat. § 105-273 or assessed for taxation purposes. The facts in both *Morgan* and *Dickey* support the conclusion that the tax assessors' actions constituted an "immaterial irregularity" pursuant to N.C.G.S. § 105-394, in that the assessors failed "to list, appraise, or assess any property for taxation or to levy any tax within the time prescribed by law." N.C.G.S. § 105-394(3) (2013). In the case *sub judice*, Union County did not fail to appraise the parcels for the years 2008 and 2009. To the contrary, Union County appraised the parcels, but did so using an arbitrary method of valuation that resulted in an assessment that substantially exceeded the true value of the parcels.

Based on the foregoing, the Commission did not err by concluding that N.C.G.S. § 105-287 applied to Pace/Dowd's appeal, as Union County attempted to change the value of the parcels in a year in which a general reappraisal was not made.

Furthermore, the Commission did not err by holding that Union County "improperly 'discovered' Parcel [3A] for tax years 2008 and 2009" as the General Assembly has stated that "[a]n increase or decrease in appraised value made under this section is effective as of January 1 of the year in which it is made and is not retroactive." N.C.G.S. § 105-287(c).

Affirmed.

Judges ELMORE and DAVIS concur.